Argued and submitted February 6, affirmed June 12, 2003

SECOR INVESTMENTS, LLC,
an Oregon limited liability company,
*Appellant,*

*v.*

Fred Charles ANDEREGG;
Beulah Anderegg; Plame & Associates;
and Robert Plame,
*Respondents.*

99-01-00182; A110918

71 P3d 538

Roy B. Thompson argued the cause and filed the briefs for appellant.

Daniel O'Leary argued the cause for respondents Fred Charles Anderegg and Beulah Anderegg. With him on the briefs were Darleen Darnall, Michelle Bellia, and Davis Wright Tremaine LLP.

Jonathan R. Gill argued the cause for respondents Plame & Associates and Robert Plame. On the brief were Robert S. Dorband, Patchen M. Haggerty, and The DuBoff Law Group, LLC.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiff, Secor Investments, LLC, appeals from a judgment in favor of defendants Fred and Beulah Anderegg (Andereggs) and Plame & Associates and Robert Plame (Plame defendants), dismissing plaintiff's claims for fraud, negligence, breach of contract, indemnity, conversion, trespass, nuisance, and intentional interference with economic relations, as well as various statutory claims. All of those claims arose, directly or indirectly, from plaintiff's acquisition of land, which had been formerly owned by the Andereggs, from the Anderegg Joint Living Trust (Anderegg Trust) in 1996. Plaintiff also appeals from the trial court's judgment awarding the Andereggs attorney fees and costs, totaling more than $245,000, pursuant to ORS 20.105.

As described below, we conclude, *inter alia*, that the trial court correctly determined that plaintiff's claims against the Andereggs were barred by claim preclusion arising from prior federal litigation; that the claims against the Plame defendants were barred by the covenant resolving the federal litigation; and that the award of attorney fees to the Andereggs was proper in that there was no objectively reasonable basis for plaintiff's claims, ORS 20.105(1), and the trial court did not abuse its discretion in fixing the amount of reasonable fees. Accordingly, we affirm.[1]

The circumstances of this dispute are quite convoluted. Nevertheless, because the procedural evolution and posture of the litigation are material to several of plaintiff's assignments of error, we must recount the procedural history in considerable detail. With respect to our review of the dismissal of plaintiff's claims by summary judgment or pursuant to ORCP 21, we recount the facts in the light most favorable to plaintiff. *Wickizer v. Hall*, 185 Or App 644, 60 P3d 1124 (2003); *Sande v. City of Portland*, 185 Or App 262, 59 P3d 595 (2002).[2]

---

[1] The Andereggs raise three cross-assignments of error. Our analysis and disposition obviates any need to address those cross-assignments.

[2] That standard of review does not, however, extend to our review of the reasonableness of the amount of attorney fees awarded by the trial court. We review that determination for abuse of discretion. *See Kidney Association of Oregon v. Ferguson*, 315 Or 135, 140-41 n 9, 843 P2d 442 (1992).

The property underlying this dispute is located in Clackamas County. Beginning around 1960, the Andereggs owned the property at issue in this case, as well as adjacent property. In the late 1960s and early 1970s, a skeet shooting range was located there.

In 1994, Sequoia Land Trust (Sequoia), which later became one of plaintiff's three owner-"members," entered into an option agreement with the Andereggs to purchase the property. The property was to be purchased in four phases over the course of several years.[3] The Plame defendants acted as the Andereggs' real estate agent and broker in that transaction. In March 1995, an addendum to the parties' agreement changed the date for exercise of the option. In April 1995, the Andereggs conveyed their interest in the option, and the property itself, to the Anderegg Trust, for which the Andereggs were cotrustees.

In February 1996, plaintiff's predecessors-in-interest, 188 Or App at 157 n 3, entered into a new option agreement with "Fred Charles Anderegg and Beulah Anderegg, Co-Trustees of the Anderegg Joint Living Trust," with a slightly different property description and price and payment terms. That 1996 option agreement, which also set out new dates by which the four phases were to be purchased, explicitly superseded any prior agreement. The Plame defendants acted as the Trust's real estate agent and broker in that transaction.

In February 1996, plaintiff purchased the first phase property. In May 1996, Squier Associates performed an environmental assessment of the property for plaintiff, noting the presence of concrete slab blocks of unknown origin, and recommending that any construction or excavation in that area be observed for signs of environmental hazards. In June 1996, plaintiff purchased the second phase property.

Plaintiff then began the process of selling the property to a third party, Heartstone, which arranged for another

---

[3] In October 1994, Sequoia assigned a 50 percent interest in its option to purchase to Classic Development, Inc. (Classic). After the execution of the 1996 option agreement described below, Sequoia, Classic, and Oregon Investment Company formed plaintiff and transferred their interests in the 1996 option to plaintiff.

environmental assessment of the property. In November 1996, Heartstone informed plaintiff that that assessment showed that a portion of the property had been used as a skeet shooting range and that soil samples taken from different locations on the property showed the presence of significant concentrations of lead. Plaintiff subsequently incurred expenses in cleaning up the lead on the property and incurred other losses, including the inability to pursue other development opportunities, because of Heartstone's withholding of part of the purchase price.

In 1997, plaintiff and its three owner-"members" brought an action in federal court, naming as defendants "Fred Charles Anderegg and Beulah Anderegg, co-trustees of the Anderegg Joint Living Trust," as well as Squier Associates. The complaint alleged:

> "Fred Charles Anderegg and Beulah Anderegg ('Anderegg') are individuals and co-trustees of the Anderegg Joint Living Trust. The Anderegg Joint Living Trust ("Trust') is a living trust that held title to the property described in Exhibit A. Anderegg and the Trust are hereinafter collectively referred to as 'Anderegg defendants.' "

The complaint went on to aver that the "Anderegg defendants" owned the property from approximately 1960 to 1996; that a skeet shooting range was operated there; that plaintiff's predecessors-in-interest had entered into an option agreement with the "Anderegg defendants"; that plaintiff had ultimately purchased the first and second phase properties from the "Anderegg defendants"; and that plaintiff had discovered in November 1996 that the second phase of the property was contaminated with lead. The complaint described the nature of the lead contamination and sought remediation costs under federal environmental cleanup statutes. The complaint also alleged claims for statutory violations under Oregon law, nuisance, indemnity, fraud, breach of contract, trespass, conversion, negligence, and declaratory relief.

On June 3, 1998, the federal court claims against the "Anderegg defendants" were dismissed with prejudice pursuant to the terms of a "Covenant Not to Sue or Enforce Judgment" (covenant) between plaintiff and its three owner-"members" as "covenantors," and "Fred Charles Anderegg, as

co-trustee of the Anderegg Joint Living Trust," and "Beulah Anderegg, as co-trustee of the Anderegg Joint Living Trust," as "covenantees." The covenant provided, in part, that the covenantees would pay $75,000 as consideration for the dismissal of the claims and further provided:

> "It is hereby stipulated and agreed by the Covenantors that they release and forever discharge the Covenantees from any and all claims, causes of action, obligations, demands and/or damages, whether direct, indirect, incidental, consequential, whether known or unknown, liquidated or contingent, past, present, or future (hereinafter cumulatively 'Claims') (1) in any way related to or arising out of the Secor Lawsuit; and (2) in any way related to or arising out of the presence of lead in the soils of the property described in Exhibit B (the same land description which the plaintiff Covenantors attached to the Amended Complaint in the Secor Lawsuit), which is attached and incorporated herein.

> "This Covenant is executed on behalf of and for the benefit of the Covenanting Parties and their respective officers, directors, employees, agents, assigns, attorneys, and all persons acting for or on behalf of the parties to this Covenant, for the purpose of achieving the mutual release of all claims known or unknown, past, present, or future. It is expressly understood and agreed, as a condition of this Covenant, that nothing contained in this Covenant shall constitute or be construed as an admission of the truth or correctness, or lack of truth or correctness, of any claims asserted by the parties to this Covenant, one against the other, nor shall this Covenant operate to extinguish or compromise any of the Covenantors' claims against persons or entities other than the Covenantees, including any agents, assigns, attorneys, or other persons acting by or on behalf of persons not specifically named as parties to this Covenant."

In January 1999, plaintiff initiated this action against the Andereggs and the Plame defendants. Plaintiff's complaint, which asserted claims substantially similar to those that had been asserted in the federal court action, alleged that the property was purchased from the Andereggs pursuant to the 1994 option agreement (rather than, as alleged in the federal action, from the Trust pursuant to the February 1996 option). The complaint also alleged that plaintiff discovered the lead contamination in January 1997,

rather than in November 1996, as had been alleged in the federal action.

After the Andereggs successfully moved to dismiss several of plaintiff's claims pursuant to ORCP 21 A, plaintiff repleaded, and the Andereggs filed an answer, with affirmative defenses and a counterclaim. The answer alleged, in part, that the Trust held title to the property at the time that it was sold to plaintiff, and denied that plaintiff had discovered the lead contamination on the date specified in the complaint. The answer further alleged, as affirmative defenses, that (1) the settlement of the federal action barred all claims against the Andereggs; and (2) alternatively, plaintiff's claims of fraud and intentional interference with economic relations were barred by the statute of limitations. Finally, the Andereggs' answer alleged as a counterclaim that plaintiff had breached the June 1998 covenant by bringing the state court action, and sought damages and attorney fees pursuant to the covenant. The Plame defendants also filed an answer, with affirmative defenses and a counterclaim, alleging in part that they had represented the Andereggs in the sale of the property and that they were released from any potential liability by virtue of the June 1998 covenant. In reply, plaintiff denied that its claims were barred by the statute of limitations and alleged that the June 1998 covenant released only the Andereggs as co-trustees of the Anderegg Trust, and not the Andereggs as individuals or the Plame defendants.

In May 1999, the Andereggs filed the first of several motions for summary judgment in this action. That motion asserted, in part, that the claims pertaining to the lead contamination of the property were barred by the June 1998 covenant and that the fraud and interference with contractual relations claims were barred by the applicable statutes of limitations. In support of that motion, the Andereggs submitted evidence that, although the lead contamination was removed from the property in January 1997, plaintiff was informed of the presence of "significant concentrations of lead" on the property in November 1996.

In opposing that motion for summary judgment, plaintiff asserted that (1) while the prior federal action had

been directed against the Andereggs solely in their capacity as "co-trustees of the Anderegg Joint Living Trust," the present action named them as "individuals"; and (2) the Andereggs had signed the June 1998 covenant solely in their capacities as cotrustees and not as individuals. Consequently, plaintiff asserted, the federal court covenant did not preclude claims against the Andereggs individually. Plaintiff also asserted that the 1996 option agreement only superseded earlier agreements between the "parties" to that agreement; that the Andereggs as individuals were not "parties" to the 1996 agreement; and, thus, the property was purchased pursuant to *both* the 1994 option agreement with the Andereggs and the 1996 option agreement with the Trust.

The trial court rejected the Andereggs' argument that the June 1998 covenant barred plaintiff's present claims, reasoning that the covenant covered claims against the Andereggs in their capacity as trustees, and not as individuals. However, the court did grant partial summary judgment against plaintiff's claims for fraud and interference with economic relationships on the ground that those claims were barred by the statute of limitations.

In the course of intensive motion practice[4] and ongoing discovery, the parties were proceeding toward a trial date in early December 1999. However, following the trial court's determination that the 1998 covenant did not bar the claims against the Andereggs as individuals, the Andereggs' counsel—who had participated in the drafting and negotiation of that covenant—determined that it would be advisable for them to withdraw because of a potential conflict of interest. Accordingly, in November 1999, the Andereggs obtained new counsel, and the court ultimately reset the trial date to February 23, 2000.[5]

---

[4] For example, in October 1999, plaintiff moved for partial summary judgment, arguing that, under ORS 465.225, the Anderegg defendants were strictly liable for the lead contamination that occurred when they owned the property. That motion was denied.

[5] That substitution of counsel, and the relatively short time between the substitution and the reset trial date in a complex case—roughly three months—is material to our assessment of the reasonableness of the trial court's award of attorney fees to the Andereggs. *See* 188 Or App at 176-78.

In December 1999, the Andereggs' new counsel filed a second motion for partial summary judgment that was directed solely against plaintiff's breach of contract claim. That motion asserted that plaintiff had no legally cognizable claim under the 1994 option agreement because that 1994 agreement had been expressly superseded by the 1996 option agreement. The trial court granted that motion.

In January 2000, the Plame defendants also moved for summary judgment, arguing that the June 1998 covenant barred all claims against them based on their conduct as agents for the Andereggs as trustees. The trial court allowed that motion.

At approximately the same time, in January 2000, plaintiff moved to amend its complaint to add a negligence claim and to request punitive damages. The new negligence claim—plaintiff's thirteenth claim for relief—alleged that all defendants had negligently misrepresented the condition of the property, including the lead contamination, knowing that plaintiff intended to develop the property for residential use. The trial court denied the motion to add the punitive damage allegations but allowed plaintiff to add the new claim for negligence. On February 4, 2000, less than three weeks before the scheduled February 23 trial date, plaintiff filed its second amended complaint.

Concurrently with the filing of the second amended complaint, and with leave of the court, the Andereggs filed their third motion for partial summary judgment. That motion asserted that plaintiff's new "negligent misrepresentation" claim was barred by the statute of limitations. The court, endorsing plaintiff's position that that claim pleaded a "continuing tort," denied that motion.[6]

On February 23, the day that trial was scheduled to begin, counsel for the Andereggs informed the trial court that he intended to move pursuant to ORCP 54 B or, alternatively, pursuant to ORCP 21 B, to dismiss all of plaintiff's

---

[6] The trial court's allowance of the Andereggs' motion for partial summary judgment against the breach of contract claim, its allowance of the Plame defendants' motion for summary judgment based on the covenant, and its denial of the Andereggs' motion for partial summary against the negligent misrepresentation claim were all included in a single order dated February 11, 2000.

claims on the ground of claim preclusion. After counsel explained that he had prepared the motion in anticipation of filing it at the close of plaintiff's case, he indicated that the trial court might prefer to consider the substance of that motion before trial. Plaintiff did not, at that point, object to the trial court considering the matter before proceeding to trial—but, instead, asked for a week to respond to it. Because of the claim preclusion motion and other pending matters, the trial court indefinitely postponed trial and set the outstanding motions for hearing.

Plaintiff subsequently filed an opposition to the Andereggs' claim preclusion motion, raising three responses: (1) ORCP 54 B was inapplicable because a motion under that rule could be made only at the conclusion of the plaintiff's evidence; (2) the motion was untimely under ORCP 21 B because such a motion must be made "within such time as not to delay the trial"; and (3) the motion was, in essence, a motion for summary judgment and, as such, was untimely in that summary judgment motions generally must be served and filed at least 45 days before trial. *See* ORCP 47 C.

The Andereggs replied by asking the court to treat their claim preclusion motion as one for summary judgment pursuant to ORCP 47. They asserted that the motion was timely under ORCP 47 C because, at that point, no new trial date had been scheduled and, thus, the 45-day rule was not implicated. The Andereggs moved pursuant to ORCP 23 A to file an amended answer and attached the proposed amended answer to that motion. That amended answer asserted, for the first time, claim preclusion as an affirmative defense.[7]

On March 9, the court, after hearing argument, indicated that it would treat the claim preclusion motion as one

---

[7] Plaintiff did not argue in the trial court, and does not argue on appeal, that the Andereggs' amended answer adding the new affirmative defense of claim preclusion, or their summary judgment motion concerning that defense, was not permissible based on ORCP 21 F, and we express no opinion as to the potential applicability of that rule had it been invoked in these circumstances. *See* ORCP 21 F (providing, subject to certain exceptions that, "[i]f a party makes a motion under this rule, except a motion to dismiss for lack of jurisdiction over the personal insufficiency of summons or process, but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted").

for summary judgment. The trial court also orally ruled that the motion to file the amended answer, which included the claim preclusion affirmative defense, would be allowed.

Ultimately, on June 29, the trial court granted the Andereggs' claim preclusion motion and entered judgment dismissing all claims of the second amended complaint against the Andereggs as being barred by claim preclusion.[8] Plaintiff timely appealed from that judgment.

The Andereggs then sought costs and attorney fees pursuant to ORS 20.105 and ORS 20.190. In November 2000, the court held an evidentiary hearing on the attorney fee petition. During his questioning of the Andereggs' attorney concerning certain billings, plaintiff's attorney informed the court that the court register did not show that either the court's order authorizing the Andereggs to file an amended answer or an amended answer itself, asserting the defense of claim preclusion, had ever been filed. After taking a short recess, the court stated:

> "It appears that this department was the culprit and is the culpable entity in the fact that the order [authorizing the Andereggs to file an amended answer and treating the claim preclusion motion as one for summary judgment] and his amended answer were not filed, not signed [by the court], but sat around here for six months in a pile of materials, regrettably."

The court then stated its intent to sign the order allowing the filing of the amended answer *"nunc pro tunc"* to March 9.

Plaintiff's counsel objected, stating:

> "I'm going to object to the signing of the order or the filing of it at this time. This case has already been appealed to the Court of Appeals for a month, so there's no jurisdiction at this level to do any act of this nature whether nunc pro tunc or otherwise.
>
> "The responsibility was [the Andereggs' attorney's] to see that the order got signed. It was signed today. It was never filed as an amended answer in that matter * * *.

---

[8] The judgment also dismissed plaintiff's nuisance claim against the Andereggs on other, alternative grounds that are immaterial to our disposition of this appeal.

"In addition to that, the filing of today is not with the Clerk of the Court. The case law to that effect is the filing of these documents is over in the filing room. Wherever he submitted his amended answer, I don't know, but certainly it's not appropriate—"

In response, the court noted that the certification attached to the proposed amended answer stated that it had, in fact, been served on plaintiff on March 9. The court further observed that the "materials were not processed timely by this department in error, and the error is going to be rectified despite your position."

Thereafter, plaintiff's counsel continued his questioning of the Andereggs' attorney, who acknowledged that

"[i]t appears from Judge Gallagher's statement that the written order had never been filed, but an order had been entered orally allowing the filing of that answer, and it also appears from Judge Gallagher's statement that the amended answer was tendered here for filing and through inadvertence didn't get filed."

Ultimately, the court signed the written order allowing the Andereggs to file their amended answer and dated that order "the sixteenth day of November, *nunc pro tunc* to March 9, 2000." That order was date-stamped as "filed" on November 17, 2000. On November 17, the Andereggs' amended answer was date-stamped as "filed"; that answer was entered in the register on November 21.

On January 29, 2001, the court entered a supplemental judgment awarding the Andereggs attorney fees and costs of $245,466.55. Plaintiff timely appealed from that supplemental judgment.

On appeal, plaintiff raises myriad assignments of error. However, our disposition of the appeal derives from our analysis of five overarching questions: (1) Does claim preclusion, flowing from the disposition of the federal litigation, bar plaintiff's claims against the Andereggs? (2) If so, was the trial court's allowance of summary judgment on that basis nevertheless erroneous because of procedural deficiencies, including the timing of the filing of the Andereggs' amended answer, which first alleged claim preclusion? (3) Did the 1998

covenant bar plaintiff's claims against the Plame defendants? (4) Were the Andereggs entitled to attorney fees under ORS 20.105(1) because there was "no objectively reasonable basis" for plaintiff's claims against them? (5) If so, did the trial court abuse its discretion in setting the amount of the Andereggs' recoverable fees?

■ We begin with claim preclusion. Plaintiff's principal substantive argument is that claim preclusion did not apply because the Andereggs, as individuals, were not parties to the covenant that terminated the federal litigation.[9] That argument misses the mark. The question, more properly framed, is whether the Andereggs were parties to the federal litigation *or were in privity with parties to the federal litigation.*

Plaintiff's entire argument is based on the following language from *Rennie v. Freeway Transport,* 294 Or 319, 323, 656 P2d 919 (1982):

"[A] plaintiff who has prosecuted one action against a defendant through to a final judgment is barred on res judicata grounds from prosecuting another action against the same defendant where the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action."

Plaintiff's sole argument is that "the parties to the two actions are different."[10]

The language plaintiff invokes does contain a correct general statement of Oregon claim preclusion (formerly known as "*res judicata*") law. While accurate so far as it goes, that language is incomplete in that it does not state that

---

[9] Questions concerning the scope of the covenant are, in fact, presented in one of the Andereggs' cross-assignments of error, concerning the denial of their first summary judgment motion on their affirmative defense of settlement. As noted, 188 Or App at 156 n 1, because of our disposition of this case, however, it is unnecessary for us to reach that issue.

[10] Plaintiff does not argue that the present claims are not "of such a nature as could have been joined in the first action." *Rennie,* 294 Or at 323. In all events, the claims in this case are, in fact, virtually identical to the claims asserted in the federal litigation.

Oregon courts have consistently reiterated that claim preclusion protects not only parties to previous litigation but also other persons who were in privity with those parties. "The preclusion doctrine—be it issue or claim preclusion—requires that '[t]he party sought to be precluded was a party or was in privity with a party to the prior proceeding.'" *Steiner v. E. J. Bartells Co.*, 170 Or App 759, 763, 13 P3d 1050 (2000) (quoting *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993)). We have noted that there exist three general categories of parties that may be in privity with parties to earlier litigation: "(1) those who control an action though not a party to it; (2) those whose interests are represented by a party to the action; and (3) successors in interest to those having derivative claims." *Stevens v. Horton*, 161 Or App 454, 462, 984 P2d 868 (1999), *rev den*, 331 Or 692 (2001).[11]

The Andereggs, as individuals, fall within the second category. The Andereggs are not only the sole trustees of the trust, they are also the grantors and the primary beneficiaries of the trust. During the Andereggs' lifetimes, the trust is to be used to provide for their "care, support, maintenance and reasonable comfort," and either of them can receive "so much or all of the net income and principal of the trust estate as we, or either of us from time to time, may request in writing." Thus, the Andereggs both controlled the defense of federal litigation as trustees of the Trust *and*, in doing so, represented and protected their own individual and personal interests as the primary beneficiaries of the Trust. In sum, the Andereggs as individuals were in privity with "Fred and Beulah Anderegg as co-trustees of the Anderegg Joint Living Trust."

■    Finally, plaintiff suggests that claim preclusion cannot apply under these circumstances because, in denying the Andereggs' first motion for summary judgment, the court ruled that the Andereggs as individuals were not protected by the covenant that settled the federal litigation. *See* 188 Or App at 160-61 (describing ruling). Plaintiff asserts that that ruling established "the law of the case" concerning the federal

---

[11] That basic rule was announced in *Wolff v. DuPuis*, 233 Or 317, 322, 378 P2d 707 (1963), which, in turn, relied on the *Restatement of Judgments* § 83 (1942).

litigation and that the court's ultimate allowance of summary judgment on claim preclusion cannot be reconciled with the earlier ruling.

Even assuming, for the sake of argument, the dubious proposition that "law of the case" could apply in this procedural posture,[12] we reject plaintiff's argument. The Andereggs' first summary judgment motion concerned the affirmative defense of settlement, which they had raised in their initial answer. That answer, after describing the federal litigation and the covenant, alleged that the Andereggs had fully performed under the covenant and that the present claims were barred. The Andereggs' original answer did not allege the existence of a final judgment in the federal litigation, much less raise the legally distinct affirmative defense of claim preclusion. In sum, the court's rejection of the Andereggs' affirmative defense of settlement, which was predicated upon the covenant's release provisions, could not, and did not, dictate the disposition of the claim preclusion defense. We thus conclude that the trial court correctly determined that plaintiff's claims against the Andereggs were barred by claim preclusion.

We turn then to the second overarching issue: Notwithstanding the substantive merit of the Andereggs' claim preclusion defense, was the court's allowance of summary judgment on that basis procedurally erroneous? In that regard, plaintiff raises two principal arguments. First, given the 45-day limitation of ORCP 47 C, the trial court could not treat the Andereggs' claim preclusion motion as one for summary judgment. Second, the claim preclusion defense was not properly before the trial court because, under ORCP 19 B and ORCP 21 A, that defense must be alleged in a responsive pleading and, at the time the court allowed summary judgment, the Andereggs' amended answer pleading that defense had not yet been filed. Indeed, plaintiff asserts, that answer was never filed until after the notice of appeal had been filed—and the trial court's *nunc pro tunc* order, purporting to file that answer retroactively, was legally ineffective.

---

[12] *See State v. Pratt*, 316 Or 561, 569, 853 P2d 827, *cert den*, 510 US 969 (1993) (law of the case doctrine applies to subsequent proceedings in the same case after a decision by an appellate court).

■      Plaintiff's first argument is unavailing. By the time the Andereggs filed their claim preclusion motion and the trial court agreed to treat that motion as one for summary judgment, the trial date had been postponed indefinitely. Thus, the 45-day limitation was inapposite.

■      Plaintiff's second argument, pertaining to the filing (or nonfiling) of the amended answer, warrants somewhat more extended discussion. We have recounted the procedural circumstances of the "*nunc pro tunc*" filing at some length. *See* 188 Or App at 164-65. Plaintiff notes that claim preclusion is an affirmative defense and, particularly, that under ORCP 19 B, in "pleading to a preceding pleading, a party shall set forth affirmatively * * * res judicata[.]" Moreover, ORCP 21 A provides that "[e]very defense, in law or fact, to a claim for relief in any pleading * * * shall be asserted in the responsive pleading thereto," with certain listed exceptions not including the affirmative defense at issue here. Thus, plaintiff asserts, the fact that the amended answer was not actually filed when it was proffered to the trial court in March 2000 was a "fatal procedural defect" that could not be corrected "*nunc pro tunc*" after the notice of appeal had been filed.

We express no view as to the merits of plaintiff's argument concerning the (in)efficacy of the "*nunc pro tunc*" filing. Assuming, without deciding, that the trial court's orders in November 1999, after the filing of the notice of appeal, were ineffective, *accord, e.g., Gillespie v. Kononen*, 310 Or 272, 276 n 7, 797 P2d 361 (1990); *Evans v. Brentmar*, 186 Or App 261, 270, 62 P3d 847 (2003),[13] plaintiff's argument still fails because it was not timely raised and preserved. That is, *in opposing summary judgment*, plaintiff

---

[13] In *Gillespie*, the court stated:

"The function of a *nunc pro tunc* entry is to make a record of what was previously done, but not then entered; not to make an order now for then, but to enter now for then an order previously made. * * * Such an order is effective only when it records a previously omitted truth—it does not create, but only speaks what has been done."

310 Or at 276 n 7; *see also Frederick & Nelson v. Bard*, 66 Or 259, 262, 134 P 318 (1913) (*nunc pro tunc* directive cannot be used as a "means of patching up a defective record by injecting therein something that did not occur").

never argued that the Andereggs could not invoke claim preclusion because the amended answer alleging claim preclusion had not been filed. Rather, as noted, plaintiff first asserted that deficiency long after summary judgment had been allowed and after this appeal had been filed.

Thus, from a preservation perspective, this case is, ultimately, indistinguishable from one in which there had been no attempt at a post-judgment *nunc pro tunc* "fix" in the trial court and, instead, the appellant had merely attempted to argue, for the first time on appeal, that summary judgment based on an affirmative defense was erroneous because an answer alleging that defense had never been filed. Just as the challenge to summary judgment in that hypothetical case would not be preserved, it was not preserved here.[14]

■ Plaintiff implies that that lack of preservation—the failure to raise a contemporaneous objection—is excusable because it did not learn of the nonfiling of the amended answer until months later. We disagree. As a factual matter, court filings are a matter of public record, including through the Oregon Judicial Information Network. Consequently, plaintiff could, practically, have identified and raised the "not filed" objection in opposing summary judgment or, at least, before the entry of final judgment on the merits several months later.

■ As a legal matter, plaintiff offers no persuasive argument that, regardless of the lack of preservation, the allowance of summary judgment in this procedural posture constituted error apparent on the face of the record. *See* ORAP 5.45. We note, moreover, that, even if the requirements of "plain error" could otherwise be satisfied, *see State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990), we would decline to exercise our discretion under *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-83, 823 P2d 956 (1991), for at least two reasons. First, this is the sort of "error" that could easily have been remedied upon a timely objection—*i.e.*, the amended answer could have been immediately filed with the clerk—

---

[14] We emphasize that plaintiff *did* preserve his objection to the propriety of the November 2000 *nunc pro tunc* orders. The point is that, whatever their merit, those objections are ultimately immaterial because plaintiff did not timely raise the pertinent objection *to summary judgment*.

without affecting the outcome. Second, plaintiff cannot credibly claim to have been prejudiced by the lack of filing because it was served with a copy of the amended answer, and the court and the parties all proceeded on the assumption that that answer had, in fact, been filed.

We thus conclude that the trial court correctly granted the Andereggs' motion for summary judgment based on claim preclusion.[15] Both plaintiff and the Andereggs agree that a decision on our part to affirm the trial court's allowance of summary judgment on claim preclusion obviates any need to address plaintiff's remaining assignments of error pertaining to the Andereggs, with the exception of plaintiff's assignment of error challenging the award of attorney fees, which we address in the final portion of this opinion.

Before addressing attorney fees-related issues, however, we proceed to the third overarching question, pertaining to the Plame defendants' liability: Did the June 1998 covenant bar plaintiff's claims against the Plame defendants?

■ Plaintiff argues that the trial court erred in concluding that the Plame defendants were entitled to dismissal because, as agents for the Anderegg Trust, they were protected by the covenant that resolved the federal litigation. In particular, plaintiff asserts that the trial court misconstrued the pertinent provisions of the covenant.

The covenant provides, in part:

> "*This Covenant is executed on behalf of and for the benefit of the Covenanting Parties and their respective officers, directors, employees, agents, assigns, attorneys, and all persons acting for or on behalf of the parties to this Covenant, for the purpose of achieving the mutual release of all claims known or unknown, past, present, or future.* It is expressly understood and agreed, as a condition of this Covenant, that nothing contained in this Covenant shall constitute or be construed as an admission of the truth or correctness, or lack of truth or correctness, of any claims asserted by the parties to this Covenant, one against the other, *nor shall this Covenant operate to extinguish or compromise any of*

---

[15] We reject, without discussion, plaintiff's other arguments as to the alleged procedural impropriety of the trial court's allowance of summary judgment.

> *the Covenantors' claims against persons or entities other than the Covenantees, including any agents, assigns, attorneys, or other persons acting by or on behalf of persons not specifically named as parties to this Covenant.*"

(Emphasis added.) Plaintiff relies on the last half of the final sentence of that paragraph, asserting that it explicitly does not extinguish claims against the covenantees' agents, but only against the covenantees themselves. The Plame defendants counter that such a reading cannot be reconciled with—and, indeed, would abrogate—the provision's fundamental purpose of providing protection not just to the "covenanting parties" but also to their "respective agents * * * and all persons acting for or on [their] behalf."

We agree with the Plame defendants. It would hardly be "on behalf of" or "for the benefit" of the covenanting parties' agents for them to be *exposed to* liability rather than *protected from* liability under the covenant. Although the provision is hardly a model of craftsmanship or clarity, the only reading that plausibly harmonizes its language is that the release extinguishes claims that are directly derivative of the claims against the named covenantees. *See generally Pioneer Resources v. D. R. Johnson Lumber Co.*, 187 Or App 341, 361, 68 P3d 233 (2003) (describing methodology for construing releases). That is, the release bars claims against the covenanting parties' agents, or other persons acting on their behalf, arising from the same transactions that were the subject of the federal litigation. Indeed, the provision's final clause, which explicitly reserves plaintiff's ability to prosecute claims against agents for parties *other than the covenanting parties*, at least implicitly corroborates that protection of the Anderegg Trust's agents, including the Plame defendants. The trial court correctly concluded that the covenant released the Plame defendants from liability.

■ We turn, finally, to the Andereggs' recovery of attorney fees, beginning with the issue of entitlement. The Andereggs asserted, and the trial court agreed, that they were entitled to recover reasonable attorney fees pursuant to ORS 20.105(1). That statute provides as follows:

> "In any civil action * * * the court shall award reasonable attorney fees to a party against whom a claim, defense

or ground for appeal or review is asserted, if that party is a prevailing party in the proceeding and to be paid by the party asserting the claim, defense or ground, upon a finding by the court that * * * there was no objectively reasonable basis for asserting the claim, defense or ground for appeal."

In particular, the Andereggs asserted that they were entitled to fees because plaintiff's conduct that led to this litigation was in bad faith[16] and plaintiff's claims were not "objectively reasonable" for several reasons, including that they were clearly barred by claim preclusion based on the judgment in the federal court action.

In response, plaintiff argued, citing *Mattiza v. Foster*, 311 Or 1, 803 P2d 723 (1990), that an award pursuant to ORS 20.105 required findings that a party had taken a nonmeritorious position *and* had done so with an "improper purpose." With respect to bad faith, plaintiff asserted, *inter alia*, that the denial of the Andereggs' first summary judgment motion demonstrated that the prosecution of this action notwithstanding the covenant could not be in bad faith.[17] In response to the Andereggs' arguments that, because of claim preclusion, plaintiff had no reasonable basis for asserting its claims, plaintiff's counsel asserted that he had never thought of claim preclusion until it was raised on the day the case was scheduled to go to trial. In a related vein, plaintiff pointed out that the Andereggs' counsel themselves apparently had not identified the claim preclusion defense until shortly before the scheduled trial date.[18]

---

[16] The Andereggs' argument concerning bad faith was based on affidavits from the attorneys who negotiated the covenant that resulted in the dismissal of the federal court litigation. In general, those affidavits averred that (a) the Andereggs and the attorneys who represented them intended that the settlement of the federal litigation resolve all claims arising from the sale of the property against the Andereggs, both individually and in their capacity as trustees; and (b) even as the federal court settlement was being negotiated, one of plaintiff's principals, as well as plaintiff's attorney who negotiated the federal court settlement, had already formed an intention, undisclosed to the Andereggs, that, after the federal litigation settled, plaintiff would bring this action against the Andereggs as individuals.

[17] Plaintiff also asserted that, in the course of the federal court negotiations, language that would have explicitly released the Andereggs from individual liability had been removed from the covenant. Plaintiff suggested that the removal of that language should have put the Andereggs on notice of plaintiff's potential ability, and intent, to pursue claims against them individually.

[18] Conversely—and ironically—in contesting the reasonableness of the amount of the Andereggs' requested attorney fees, plaintiff's counsel suggested that the

In awarding fees, the court determined that plaintiff had acted in bad faith. The court found that, in settling the federal court litigation, the Andereggs reasonably believed that they were settling plaintiff's claims against them in any capacity:

"Whether or not they're described as individuals or co-trustees, the fact is that they are the same human beings, and I can see in a Superfund case where anyone could be sued along the line, it seems to me, that that's a very legalistic approach when the people, the very people that are in that chain of title, are initially the individuals, and subsequently, for the sake of legal status, converted to co-trustees. They're the same people. It's not like individuals different in time and place and interest; they're all the same, all four of these Andereggs in an individual capacity or a co-trustee capacity."

The court further found that plaintiff's principal, who never intended to release the Andereggs individually, acted in bad faith in accepting $75,000 to settle the federal court action:

"It seems almost preposterous to me that Mr. and Mrs. Anderegg would write a check for $75,000 either knowing or not being informed of the fact that they are still liable down the road.

"[Plaintiff's principal's] position seems to be, in writing, that he never intended to release the Andereggs individually; and if that is so, then his motive I think is questionable to accept $75,000 from Mr. and Mrs. Anderegg when they're wearing a co-trustee hat and not when the hat is off [that] is beyond good advocacy. Beyond it."

On appeal, plaintiff argues first that the trial court erred in basing its award on a "bad faith" standard, because the proper standard under ORS 20.105(1) is "no objectively reasonable basis for asserting the claim." Plaintiff is correct that "bad faith" is immaterial to a determination of entitlement to fees under ORS 20.105. However, in the trial court, plaintiff took the position that, under ORS 20.105, the court was required to consider *both* "bad faith" *and* the objective

Andereggs' second law firm had spotted the claim preclusion defense soon after undertaking the representation in November 1999 but had deliberately held off asserting the defense in order to run up billings. The trial court rejected that suggestion, which is utterly unsupported by the record.

reasonableness of plaintiff's claims—that is, that those were conjunctive conditions of entitlement.[19] Thus, any error on the trial court's part in considering "bad faith" was invited error.

In all events, as both parties acknowledge, entitlement to fees under ORS 20.105 ultimately depends on the determination of whether plaintiff's claims were not "objectively reasonable." That determination is a matter of law. Consequently, regardless of the trial court's reference to "bad faith," we will affirm as to entitlement if there was "no objectively reasonable basis" for plaintiff's claims against the Andereggs. As before the trial court, the Andereggs assert that claim preclusion so clearly barred plaintiff's claims that those claims could not be deemed "objectively reasonable." Plaintiff responds that the denial of the Andereggs' first summary judgment motion based on the defense of settlement and release demonstrates that there was, at least, a reasonable dispute concerning the preclusive effect of the federal litigation.

We conclude that, given the patent applicability of claim preclusion, there was no objectively reasonable basis for plaintiff to prosecute its claims against the Andereggs. As noted above, plaintiff's claims here and its claims against the Andereggs *qua* trustees in the federal litigation are congruent, and the Andereggs as individuals were in privity with the Andereggs as trustees in the federal litigation. *See* 188 Or App at 167-68. Plaintiff has not offered any colorable explanation as to why, given those circumstances, claim preclusion is not manifestly dispositive. In sum, plaintiff has presented no objectively reasonable basis, either legal or factual, from which a court might conclude that its claims are *not* barred by claim preclusion.

Conversely, plaintiff's reliance on the denial of the Andereggs' first summary judgment motion misses the mark. In denying summary judgment on the defense of settlement,

---

[19] As noted above, plaintiff relied on *Mattiza* for that proposition. *Mattiza*, however, was based on a prior version of ORS 20.105(1), which provided in pertinent part that attorney fees could be awarded to a prevailing party "upon a finding by the court that the party * * * acted in bad faith, wantonly or solely for oppressive reasons."

the court rejected the Andereggs' arguments that the terms of the covenant covered them as individuals, as well as in their capacity as trustees. As described above, the defense of settlement, which turned on the scope of the covenant, was legally and factually distinct from claim preclusion. *See* 188 Or App at 168. Thus, the court's rejection of the former was in no way inconsistent with its acceptance of the latter, *id.*—and it is because of the latter that there was no "objectively reasonable basis" for plaintiff's prosecution of its present claims against the Andereggs.

■ We turn then to the final issue: Did the trial court abuse its discretion in fixing the amount of the Andereggs' recoverable attorney fees? *See Kidney Association of Oregon v. Ferguson*, 315 Or 135, 140-41 n 9, 843 P2d 442 (1992) (describing standard of review).

In this context, there is a certain tension—if not out-right ironic incongruity—in the parties' positions, particularly when viewed in conjunction with their arguments concerning entitlement. The Andereggs, who contend that the application of claim preclusion was so clear that plaintiff's claims against them were not objectively reasonable, nevertheless assert that the expenditure of nearly $250,000 in fees before securing dismissal on that basis was "reasonable." Conversely, plaintiff, which contends that its claims were objectively reasonable, and which itself vigorously and intensively litigated those claims over more than a year, contends that that expenditure by the Andereggs was unreasonable.

Ironies aside, plaintiff's challenge to the reasonableness of the award is essentially, "If claim preclusion was so obvious, it couldn't have been reasonable for experienced counsel to have billed over $200,000 before raising that defense." There is a certain initial plausibility, and even innate appeal, to that argument. However, in the totality of the circumstances of this complex and extremely hard-fought litigation, we cannot say that the trial court abused its discretion in fixing the amount of recoverable fees.

As noted, the Andereggs were represented by two different firms during the course of this litigation. *See* 188 Or App at 161. Initially, they were represented by the Lane

Powell firm, which had also represented the Anderegg defendants in the federal litigation, including the negotiation and drafting of the covenant. However, in late 1999, after the denial of the Andereggs' first summary judgment motion based on the defense of settlement, Lane Powell withdrew because of a potential conflict of interest based on its involvement with the covenant. In mid-November 1999, the Andereggs retained the Davis Wright firm, which represented them thereafter. Of the trial court's attorney fee award, approximately $41,000 was for services rendered by Lane Powell between January and November 1999, and the balance was for Davis Wright's services thereafter, into the summer of 2000.

Plaintiff's sole challenge on appeal to the award of fees for the Lane Powell firm's services is that *none* of those fees were recoverable because, before undertaking to represent the Andereggs in this action, the firm should have identified the conflict that ultimately caused its withdrawal. We disagree.

We emphasize, at the outset, that the trial court *did* substantially *reduce* the Andereggs' recovery for Lane Powell's services. Lane Powell generated billings of over $50,000, and the trial court reduced those fees to approximately $40,000 because "their conflict should have been discovered at an earlier date." On appeal, plaintiff offers no convincing argument—or, indeed, any argument at all—as to why that reduction was not sufficient to capture any inefficient overlap or duplication of services between Lane Powell and Davis Wright resulting from the former's tardy identification of the potential conflict and consequent withdrawal. Beyond that, plaintiff offers no argument as to why the substantial services Lane Powell rendered for the Andereggs over ten months from the commencement of this action were unreasonable or that the fees charged for such services were unreasonable.

With respect to the Davis Wright firm's fees, plaintiff asserts that the expenditure of over $200,000 is *per se* unreasonable for a case that did not ultimately go to trial. Again, in this context, we disagree.

At the time Davis Wright entered the case in mid-November 1999, the litigation was entering an intensive stage, with trial rapidly approaching. At that time, the trial court file consisted of six large volumes, discovery was ongoing, and numerous motions were pending, including plaintiff's motion for partial summary judgment and plaintiff's motion to amend its complaint. *See* 188 Or App at 161-63.

The broadsides of motions, cross-motions, and responses to motions did not abate as the trial date approached. Rather, they grew more intense. Obviously, many were generated by the Andereggs themselves—but the barrage of paper was hardly one-sided. In all events, the motions and responses that Davis Wright filed on the Andereggs' behalf between entering the case in late 1999 and the allowance of summary judgment on claim preclusion in March 2000 were all colorable and, in many instances, successful. We note, parenthetically, that, because of the parties' respective efforts—everyone contributed—the trial court record here ultimately filled 16 large volumes.

In sum, Davis Wright entered complex litigation on a fast track and was immediately, intensively engaged on a variety of levels and on several fronts. The firm necessarily and properly engaged in motion practice to advance its clients' interests while simultaneously preparing for trial. Within three months of its retention, the firm identified and litigated the decisive issue, obviating the need for a protracted trial. Given those circumstances, we cannot fault—or, rather, we cannot say that the trial court abused its discretion in declining to fault—Davis Wright for failing to more promptly seek dismissal based on claim preclusion.

We note, finally, that a substantial portion of the fees awarded pertain to services rendered after the allowance of summary judgment and before the entry of the final judgment and supplemental judgment awarding attorney fees. Plaintiff, at least on appeal, does not assert any cognizable challenge to the reasonableness of those services and fees. The trial court did not err in fixing the amount of recoverable attorney fees.

Affirmed.