Argued and submitted February 20, limited judgment affirmed; supplemental judgments reversed June 20, 2007

## Heidi Ann BENAMAN,
*Petitioner-Respondent,*

*v.*

## Lisa ANDREWS,
*Respondent-Appellant.*

Clackamas County Circuit Court
CCV0106315; A129153

162 P3d 280

Adam Dean argued the cause for appellant. On the briefs were Donald J. Molnar and Coit & Dean, PC.

Arthur B. Knauss argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ARMSTRONG, J.

**ARMSTRONG, J.**

■ Respondent appeals a limited judgment of the Clackamas County Circuit Court denying her motion to vacate or modify a June 2001 permanent stalking protective order (SPO) issued pursuant to ORS 163.735, as well as two supplemental judgments awarding attorney fees to petitioner under ORS 20.105(1) based on the court's determination that respondent's efforts to have the SPO set aside were not objectively reasonable. We review *de novo, Hanzo v. deParrie,* 152 Or App 525, 953 P2d 1130 (1998), *rev den,* 328 Or 418 (1999); *Boyd v. Essin,* 170 Or App 509, 12 P3d 1003 (2000), *rev den,* 331 Or 674 (2001), giving due deference to the trial court's demeanor-based determinations of credibility, *see Krueger v. Ropp,* 282 Or 473, 479, 579 P2d 847 (1978); *State ex rel Juv. Dept. v. G. P.,* 131 Or App 313, 319, 884 P2d 885 (1994). We affirm the trial court's denial of the motion to vacate or modify the SPO, but we reverse its award of attorney fees.

The parties were next-door neighbors and friends in West Linn. In March 2001, they had a dispute over the location of a fence. In June 2001, petitioner sought, and the circuit court issued, a permanent uniform stalking citation against respondent based on findings that respondent was making vulgar phone calls to petitioner, harassing her, degrading her friends, sending faxes and e-mails, following petitioner through the neighborhood, giving petitioner "the finger," and playing loud hate music. The circuit court's order prohibited respondent from having contact with petitioner. The order defined "contact" as:

> "Coming into visual or physical presence of the petitioner except for incidental contact as neighbor.
>
> "Following the petitioner * * *.
>
> "Waiting outside the home, property, place of work or school of the petitioner * * *.
>
> "Sending or making written communications in any form to the petitioner * * *.
>
> "Speaking by any means with the petitioner * * *.

"Communicating through a third person with the petitioner * * *.

"Committing a crime against the petitioner * * *.

"Communicating with a third person who has some relationship to the petitioner * * * with the intent of affecting the third person's relationship with the petitioner * * *.

"Damaging the home, property, place of work or school of the petitioner * * *.

"Delivering directly or through a third person any object to the home, property, place of work or school of the petitioner * * *.

"Not play [*sic*] music audible on petitioner's property, specifically, but not limited to songs 'TNT' or 'Dirty Deeds Done Dirt Cheap.' "

In August 2004, respondent filed a *pro se* motion to terminate the SPO, which she voluntarily dismissed two days before the scheduled hearing. In January 2005, respondent again sought relief from the SPO, this time represented by an attorney, asserting that, in light of changed circumstances since the issuance of the SPO—primarily her having moved away—the justification for the order no longer exists. At the hearing, the court heard testimony from petitioner concerning respondent's conduct after issuance of the SPO. Petitioner testified that, three days after the issuance of the SPO, in June 2001, respondent placed unsightly boards on a gazebo in her yard on the side facing petitioner's house. In August 2001, within two months after the issuance of the SPO, respondent directed threatening communications toward petitioner, including telling her, "If you thought you were scared before, you should be really scared now," and pointing a finger at petitioner and saying, "You are going to get it." Petitioner was arrested in August 2001 for violating the SPO. After her arrest, respondent began shining a large vapor light from the outside of her house into petitioner's yard. The parties later signed a civil compromise allowing for dismissal of the charges against respondent. Petitioner testified that, as required by the civil compromise, respondent removed the boards from the gazebo, cleaned up her yard,

and moved the light that was shining onto petitioner's property.

Petitioner and respondent have not had any personal contact since the end of 2001; however, petitioner testified that, since the signing of the civil compromise, respondent has engaged in other conduct that causes her to remain fearful. Petitioner believes that on Christmas Eve 2001, respondent or her husband parked two 26-foot U-Haul trucks on the street adjacent to petitioner's residence. Also on Christmas Eve 2001, respondent erected a clothes line in her yard, from which she hung women's undergarments for a period of three months, illuminated with spotlights at night. Petitioner also testified that, after the civil compromise, and until about six months before respondent moved in the fall of 2003, respondent would frequently stare at petitioner from her house for up to 45 minutes at a time. In August 2003, the day after the statute of limitations ran on respondent's alleged August 2001 violations of the SPO, respondent returned the spotlight to its original location so that it once again shone into petitioner's yard. In that same month, respondent filed a lawsuit against petitioner seeking damages of $500,000, which was subsequently dismissed. The trial court took judicial notice of the judgment in that case, in which the court had awarded attorney fees to petitioner for the reason that respondent's claims were malicious and motivated by a desire to retaliate against petitioner.

In the fall of 2003, respondent moved to a new residence several miles from the property, but she continued to own the property. Since that time, apart from legal filings, respondent and petitioner have had no interaction. However, in October 2004, after respondent filed her first motion for relief from the SPO, unsightly boards reappeared on the side of respondent's gazebo facing petitioner's property. Petitioner testified that the above-described incidents cause her to remain in fear of respondent. Petitioner testified that respondent

"continues to make herself available for me to see things to remind me that she's still there, and even though she can't get arrested for trashing her gazebo, or hanging a vapor light, or hanging up bras and a pair of panties inside out

with the crotch facing my yard spotlighted for months, maybe she can't get arrested for that but she's telling me that she's still there."

The court also heard from respondent. She testified that the SPO has made her life difficult and prevented her from enjoying her yard. She has undergone mental health counseling relating to the SPO and her relationship with petitioner. Respondent denied ever having threatened petitioner and specifically denied the conduct that gave rise to the civil compromise in August 2001. She denied placing boards on the gazebo in her yard, using or shining a spotlight on her clothesline, shining a light onto petitioner's property, or parking trucks in front of petitioner's house. She testified that as a result of the SPO, she has lived her life in fear.

The trial court denied respondent's motion, concluding that it had no authority under the statutes to modify the order. Further, the court said, assuming that it had authority to grant the requested relief, it would not do so, finding that respondent was "one of the least credible people I have had occasion to see in court,"[1] and had not met her burden of

---

[1] The following are excerpts of respondent's testimony on cross-examination by petitioner's counsel:

"Q [By petitioner's counsel]: Now I'll show you what's been marked as Exhibit 3, for example. Is that your gazebo in your backyard?

"A: Correct.

"Q: Do you agree that's trashed.

"A: One person's trash is another person's treasure, sure. I don't know if I would agree that anything is trashed in my yard.

"Q: Okay. Would you want that to be a structure on her side facing you in that condition?

"A: If that was her yard then that's her private yard.

"Q: Does it look like that on the other side?

"A: It doesn't matter what it looks like, because that's her private yard.

"Q: Okay. Who put the boards up?

"A: I don't know.

"Q: Did some phantom come on the property and do that?

"A: Who knows? I don't know.

"Q: Okay. Well, it's either you or your husband, wasn't it?

"A: Is that the case? I don't know.

"Q: Well, who else would it be?

"A: You tell me.

"Q: Okay. Well, you must know what goes on on your property.

proof. The court explained that respondent's answers to questions relating to the gazebo, the trucks, and the lingerie were

"Q [Respondent's counsel]: Your Honor, asked and answered, Your Honor, she does not know.

"Q [Petitioner's counsel continuing]: Are you unequivocally stating that your husband did not do that?

"A: I'm unequivocally saying that I do not know.

"Q: Okay. Did you ever ask him to take those boards down?

"A: Yes, I did.

"Q: Okay. Did he ever do it?

"A: Yes, he did.

"Q: He did it after the civil compromise?

"A: During, yes.

"Q: So those boards were up there for almost over a year?

"A: I guess so.

"Q: Okay. I'll show you what's been marked Exhibit 5. That depicts the gazebo and the clothesline, correct?

"A: Correct. On my property, correct.

"Q: Is there—Do you agree that there are at least 12 foot high poles?

"A: I don't know how tall they are.

"Q: They're over your head, though, are they not?

"A: I don't know.

"Q: Was there a spotlight illuminating on it?

"A: No, there wasn't a spotlight illuminating on it. I had backyard Malibu lighting, which is backyard lighting, same as [petitioner] has in her yard.

"Q: Whose clothes are those on your line?

"A: Oh, those are just various rags that were used around the house.

"Q: Well, one's a bra, isn't it?

"A: Well, it's a piece of material from what I see.

"Q: Is it a bra?

"A: You tell me. It's a piece of material.

"Q: You're the witness, is it a bra or not?

"A: It's a piece of material on the clothesline.

"Q: Is that a woman's panties there?

"A: It's a piece of material on the clothesline.

"Q: How long was that up?

"A: I do not know.

"Q: Okay. It was up for at least six months, correct?

"A: I do not know.

"Q: Okay. Do you wash clothes and leave them out for six months at a time, or do you take them down after a day?

"A: It depends on if it's a rag. If it's something that we use in the yard, I don't know, it may come up, it may come down, I don't know. It's in my yard.

"Q: Okay. And Exhibit 9. Is that the condition of the gazebo at this time?

"so unbelievable as to approach the level of perjury in my estimation, and you're utterly and totally unbelievable, Mrs. Andrews, and you're your own worst enemy, and your conduct in court I probably—as indicated in Mr. Dean's closing, I'm not going to modify the order as respondents requested to order that you have a mental health evaluation, because I don't think I have the authority to do that either, but I think I probably missed the mark based on what I've seen of your conduct here in court. You scare me as well. [Petitioner] has a right to have reasonable apprehension of you, *and let the record reflect that [respondent] is nodding her head in agreement with me as I say this, and is speaking in a soft voice of, 'Oh, really?'* * * * By outright threatening the petitioner on August 4th and 5th of 2001, by parking trucks or having trucks parked in a fashion that was intended to frighten the petitioner, by filing these

---

"A: I have not been to that house in I don't know how long, a year and a half. I do not know the condition of it.

"Q: When did the renters move in?

"A: I do not know.

"Q: Okay.

"A: I don't go anywhere near that house.

"Q: Now there were no such boards on there until right before you—

"A: I do not know. I do not know.

"Q: You don't know who put those boards up?

"A: I do not know.

"Q: Did you or your husband rent the trucks on Christmas Eve?

"A: I did not rent trucks.

"Q: Did your husband?

"A: I do not know.

"Q: Does he rent trucks from U-Haul?

"A: Sometimes he does. He's a contractor, and rents different things. He does his own business. I, you know, don't know what he uses.

"* * * * *

"Q: Is your name on your husband's company?

"A: No.

"Q: What's the name of the company?

"A: Is that relevant? I don't understand how that's relevant.

"THE COURT: Answer the question.

"THE WITNESS: Andrews Properties.

"Q: Okay. And you're saying that [you're] not on that company's name?

"A: No."

frivolous and unwarranted motions, which were without any merit, which were clearly filed for a desire to retaliate against the petitioner, that when you take all of those things together with the statements they can only be intended, the fact finder can conclude that it was intended to intimidate the petitioner in this case.

"The petitioner's apprehension of imminent physical injury from the respondent was objectively reasonable at the time I issued this order. It continues to be to this very day based on what I've heard here in court, what I've observed personally of the respondent's demeanor here in these judicial proceedings."

(Emphasis added.) The court found that respondent

"has engaged in a continuous course of conduct, which the court finds was motivated by her desire to retaliate against petitioner for having originally been granted a permanent Stalking Order. These activities included:

"a. The trashing of a gazebo on respondent's property causing an unsightly view towards petitioner's property.

"b. The maintaining of an unsightly clothesline with unsightly garments thereon.

"c. Outright threats to petitioner on two occasions.

"d. Parking of rental trucks in front of petitioner's residence with the purpose to harass or annoy.

"e. Filing frivolous Motions to vacate the Stalking Order."

Taken all together, the court ruled,

"these actions on the part of respondent were intended to further intimidate petitioner and that petitioner had a reasonable apprehension of threat to her personal safety. These apprehensions continue to this date."

Respondent appeals.

Subsequent to the trial court's order, in *Edwards v. Biehler*, 203 Or App 271, 277, 124 P3d 1256 (2005), we held that a permanent SPO may be terminated when, on the respondent's motion, a court finds that the criteria for issuing the order are no longer present.

**** Under ORS 163.738(2)(a)(B), the court may enter an SPO

"if the court finds by a preponderance of the evidence that:

"(i) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(iii) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

As the party seeking to set aside the SPO, respondent has the burden of demonstrating that the concerns that underlay the issuance of the original SPO have sufficiently abated that the order should be set aside. *See, e.g.*, OEC 305 ("A party has the burden of persuasion as to each fact the existence or non-existence of which the law declares essential to the claim for relief or defense the party is asserting."). The court's function in determining whether an SPO should be terminated is not to re-evaluate the correctness of the original order *or* to determine whether the circumstances since the issuance of the original SPO would be sufficient to justify the issuance of a new SPO. "The court's inquiry will focus primarily on whether petitioner continues to suffer 'reasonable apprehension' due to the past acts of the respondent[.]" *Edwards*, 203 Or App at 277. Although an awareness of the circumstances giving rise to the original order is necessary to the court's determination, the circumstances subsequent to the order also bear on whether the petitioner continues to suffer a "reasonable apprehension."

Respondent contends that she has had no personal contact with petitioner since moving in the fall of 2003, and that the circumstances since the issuance of the SPO are such that a person would not continue to have reasonable apprehension for her safety based on the conduct that gave rise to the issuance of the SPO. Specifically, respondent

argues that, even assuming that she has engaged in the conduct described by petitioner since the issuance of the SPO, that conduct is not of the type that should cause petitioner reasonable apprehension for her personal safety, and respondent's move from the property has abated any possible threat.

We have reviewed the record *de novo* and, as did the trial court, we find that respondent's testimony at trial was not credible and that she did engage in the conduct complained of by petitioner, including the verbal threats in August 2001 that gave rise to the civil compromise. In light of the higher standard applied to the evaluation of expressive conduct, *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999) (Article I, section 8, of the Oregon Constitution requires proof that the contact constitutes a threat that "instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts."), we agree with respondent that her conduct subsequent to the signing of the civil compromise would not independently establish the right to an SPO. However, that conduct shows that, as recently as a few months before the filing of her motion, respondent actively directed her anger against petitioner by putting unsightly boards back on the gazebo on respondent's property. Her blatant lying on the witness stand about her participation in or even awareness of that conduct strongly suggests that she has not constructively resolved the emotional issues that precipitated the conduct giving rise to the SPO and, in fact, continues to pursue her vendetta. We conclude that respondent, as the party with the burden of proof, has failed to establish that petitioner no longer has a reasonable apprehension for her safety. We accordingly affirm the trial court's denial of petitioner's motion for relief from the SPO.

■ Respondent asserts further that the trial court erred in awarding petitioner attorney fees under ORS 20.105. That statute provides:

> "In any civil action, suit or other proceeding in a circuit court or the Oregon Tax Court, or in any civil appeal to or review by the Court of Appeals or Supreme Court, the court shall award reasonable attorney fees to a party against

whom a claim, defense or ground for appeal or review is asserted, if that party is a prevailing party in the proceeding and to be paid by the party asserting the claim, defense or ground, upon a finding by the court that the party willfully disobeyed a court order or that there was no objectively reasonable basis for asserting the claim, defense or ground for appeal."

In the limited judgment denying respondent's motion to vacate or modify the stalking order, the trial court found that there is no statutory authority for the termination of a stalking order and that respondent's motion to terminate or modify or amend the stalking order was a frivolous action. In two supplemental judgments, the trial court found that there was no objectively reasonable basis for respondent to have sought to set aside the permanent stalking order, "in that the evidence overwhelmingly establishes the absence of any such objectively reasonable basis for respondent to further litigate this matter." The court awarded attorney fees to petitioner under ORS 20.105 for prevailing on both the August 2004 and January 2005 motions to terminate the SPO.

■ ■ We review the trial court's decision to award fees under ORS 20.105 for errors of law. *Secor Investments, LLC v. Anderegg*, 188 Or App 154, 175, 71 P3d 538, *rev den*, 336 Or 146 (2003) ("[E]ntitlement to fees under ORS 20.105 ultimately depends on the determination of whether plaintiff's claims were not 'objectively reasonable.' That determination is a matter of law."). It is possible that the trial court awarded fees because, as it found in its rulings from the bench, respondent filed her motions because she was personally motivated by a desire to retaliate against respondent. The controlling standard under ORS 20.105, is whether there was "no objectively reasonable basis for asserting the claim." Thus, respondent's personal motivation for seeking relief is not relevant. The trial court may also have based its ruling on its conclusion that there is no statutory authority for termination of a permanent SPO. In light of our holding in *Edwards*, that a person subject to a SPO may seek to terminate it when the criteria for issuing the order are no longer present, it was not objectively unreasonable for respondent to seek to terminate the SPO after she had moved away from the West Linn

house. We accordingly reverse the supplemental judgments awarding attorney fees.

Limited judgment affirmed; supplemental judgments reversed.