Argued and submitted January 28, award of attorney fees reversed September 22, respondent's petition for reconsideration filed November 29 and appellant's response to petition for reconsideration filed December 10, 2004, allowed by opinion February 16, 2005
See 197 Or App 560 (2005)

David DIMEO,
*Respondent,*

*v.*

Darren B. GESIK,
Joseph E. Chrisman,
and Bonita Jewell Chrisman,
*Defendants,*

*and*

WESTERN BANK,
a division of Washington Mutual,
*Appellant.*

972918; A119453

98 P3d 397

Jonathan M. Radmacher argued the cause for appellant. With him on the briefs was McEwen Gisvold, LLP.

Thomas H. Anderson argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

This is the second time this case has been before us. In *Dimeo v. Gesik*, 164 Or App 567, 993 P2d 183 (1999), we reversed the trial court's grant of summary judgment in favor of plaintiff Dimeo and against defendant Western Bank (the bank). On remand, plaintiff prevailed at trial, and the bank does not challenge that result. After trial, however, the trial court entered a supplemental judgment[1] awarding attorney fees to plaintiff under ORS 20.105(1) on the ground that the bank had asserted a counterclaim for which it had no objectively reasonable basis.[2] The bank appeals from that judgment, raising five assignments of error. Because we conclude that the bank's counterclaim—although ultimately unsuccessful—was objectively reasonable, we address only the bank's first assignment of error. We reverse the trial court's judgment awarding attorney fees.

We take the facts from our prior opinion. The subject property originally was owned by Dorcia Johnson. She sold the property to Darren Gesik, subject to two trust deeds that Johnson had placed against the property. Gesik then gave two additional trust deeds to secure two separate $100,000 loans, one to Dimeo and one to Joseph and Bonita Chrisman (the Chrismans). All parties' interests were properly recorded.

Thereafter, Gesik sought financing from the bank to pay off Johnson. The bank offered Gesik a $110,000 home equity line of credit, conditioned on the issuance of a standard title insurance policy showing the bank's trust deed in

---

[1] In 2003 the legislature defined the term "supplemental judgment." *See* ORS 18.005(15). That definition applies only to judgments entered on or after January 1, 2004. Or Laws 2003, ch 576, § 45(1). Because the judgment in this case was entered before that date, ORS 18.005(15) does not apply.

[2] ORS 20.105(1) provides:

"In any civil action, suit or other proceeding in a circuit court or the Oregon Tax Court, or in any civil appeal to or review by the Court of Appeals or Supreme Court, the court shall award reasonable attorney fees to a party against whom a claim, defense or ground for appeal or review is asserted, if that party is a prevailing party in the proceeding and to be paid by the party asserting the claim, defense or ground, upon a finding by the court that the party willfully disobeyed a court order or that there was no objectively reasonable basis for asserting the claim, defense or ground for appeal."

the first position. The bank received a preliminary title report from Lincoln County Title and Escrow showing the Dimeo and Chrisman interests in the property. According to the bank, it then received a title policy from Stewart Title, an affiliate of Lincoln County Title and Escrow. The title policy showed the bank in first position and made no reference to the Dimeo and Chrisman liens. After the funds were disbursed, Gesik used part of the funds to pay off the two trust deeds that Johnson had placed against the property.

> "Dimeo then initiated this action seeking judicial foreclosure of his trust deed, naming as defendants both the Chrismans and Western Bank. * * * Western Bank counterclaimed against Dimeo and cross-claimed against the Chrismans, alleging that it was entitled to superior position by virtue of the doctrine of equitable subrogation on the ground that it was justifiably unaware that the Dimeo and Chrisman liens had not been discharged. Western Bank moved for summary judgment on its theory of equitable subrogation. Dimeo also moved for summary judgment, arguing that the bank's reliance on the doctrine of equitable subrogation was unavailing, given that it had not acted in justifiable ignorance of the intervening liens. The trial court allowed Dimeo's motion, denied Western Bank's, and entered judgment accordingly."

*Dimeo*, 164 Or App at 570. As noted, on appeal, we reversed.

The bank does not dispute that it initially knew of the Chrisman and Dimeo liens. But the bank claims that it was excusably ignorant of the continued existence of those liens at the time it released the funds for the loan to Gesik. Before examining the record in that regard, we emphasize that the question is not whether the bank should have prevailed on its equitable subrogation claim. *See Mattiza v. Foster*, 311 Or 1, 8, 803 P2d 723 (1990) ("A failure to prevail does not, alone, render a party's position meritless or even suggest that it is."). Rather, the narrow question is whether the bank had an objectively reasonable basis for asserting that it was excusably ignorant of the Chrisman and Dimeo liens when it released the loan funds.

When it filed its first amended answer asserting the equitable subrogation claim, the bank had an affidavit from

James McGinnis, the manager of the bank's Tillamook branch. In that affidavit, McGinnis stated:

> "I phoned Lincoln County Title Company immediately after receiving and reviewing their preliminary title report to discuss that Western Bank required that David Dimeo and the Chrisman's [sic] liens * * * would have to be subordinated to Western Bank's required first trust deed position or removed otherwise. I was assured this would occur, and I thereafter concluded Western Bank's position would be protected by our instruction to the title company and their assurances the Dimeo and Chrisman liens would be subordinated or removed.
>
> "On or about October 8, 1996, the loan was disbursed and about that time Western Bank received a title policy stating that Western Bank had a first position in that no other liens were noted on the policy."

In his deposition testimony, McGinnis also stated that he was assured by a Lincoln County Title employee that "she would not disburse [the] funding until [the bank] would be in a first lien position." McGinnis testified, "I funded the loan based on Vickie Ames['s] assurances that my deed of trust would be in a first position, and that was affirmed when I got my title insurance."[3] Ames, in turn, testified that it was part of her job to obtain a reconveyance or subordination. Ames stated that she had spoken with Gesik before the loan closed and that—although she did not remember the specifics of the conversation—they had talked about Dimeo and Chrisman "releas[ing] their interest so that Western [Bank] could go into first position[.]" Ames also testified at deposition (and later at trial) that she would not have handled the transaction differently if she had received McGinnis's instructions in writing, instead of orally.

The parties disagreed about when McGinnis reviewed the "final" title insurance policy. As set out above, when this case previously was before us the bank represented that, in disbursing the funds, McGinnis had relied on

---

[3] Ames was the Lincoln County Title employee with whom McGinnis had regularly dealt for a number of years. Although he could not state with certainty that his conversation regarding the loan at issue here was with Ames, McGinnis "assumed" that she was the one with whom he dealt on that loan.

the title insurance policy showing the bank in first position. At trial following remand, McGinnis testified that he did not receive any updated title information until after closing. The bank now concedes that McGinnis did not consider the title insurance policy in deciding to disburse the funds.

Following trial on remand, the trial court made findings of fact and conclusions of law on plaintiff's motion for attorney fees. The court found that its earlier summary judgment had been reversed by this court

"based upon Western Bank's representation that it was excusably ignorant of the Dimeo and Chrisman liens at the time of closing its loan because it was relying upon the escrow officer's verbal assurances that it would be in first position and a final title report that showed the bank in first position. That representation by Western Bank was false."

The trial court found that the bank on several occasions "falsely represented in its brief" to this court that it had relied on the written title policy in disbursing the funds. Finally, the court found:

"The bank manager[, McGinnis], and the escrow officer[, Ames], also both admitted at trial that they had no evidence that the title company had given the bank verbal assurances that it would be in first priority. McGinnis and Ames both testified that they had no recollection of talking to each other about this transaction, and no recollection of any verbal assurances that Western Bank's trust deed would be put in first priority."

The trial court concluded that "Western Bank had no objectively reasonable basis for asserting the defense of equitable subrogation, and it actively misrepresented to the court that facts existed to support its claim for equitable subrogation when such facts did not exist." We turn to that issue on appeal.

In our opinion in the bank's prior appeal, we explained the relevant legal inquiry:

"[W]e must determine whether, as a matter of law, Western Bank was excusably ignorant of the intervening Dimeo and Chrisman liens. There is no dispute that Western Bank initially had actual knowledge of the liens. The preliminary

title report revealed the existence of the liens. The bank manager even called a representative of the title company to talk about the necessity of obtaining the discharge of the liens. Not surprisingly, therefore, Western Bank concedes that it had actual knowledge of the liens, at least as of the time of the receipt of the preliminary title report.

"Western Bank nevertheless argues that, *at the time that it released the funds*, it was ignorant of the intervening liens, because it had instructed the title company to make sure that the liens were either paid or subordinated, and because, consistent with those instructions, a final title report made no mention of the liens. Dimeo argues that, as a matter of law, the bank's actual knowledge of the intervening liens cannot have been, in effect, erased by the subsequent title report. According to Dimeo, it was grossly negligent of Western Bank to rely on a subsequent title report that did not explain what had happened to the intervening liens. Western Bank argues that it is routine for lenders to rely on final title reports that provide different information from what was provided in a preliminary title report."

*Dimeo*, 164 Or App at 571-72 (emphasis in original). We suggested that the existence of excusable ignorance might depend, at least in part, on "what is commercially reasonable under these circumstances." *Id.* at 572.

■      The controversy in this attorney fee dispute now centers on what happened between the time that the bank received the preliminary title report showing the existence of the Dimeo and Chrisman liens and the time that the escrow company disbursed the loan funds. The bank asserts that its actions during that period support an equitable subrogation claim; plaintiff argues otherwise. Before examining the record in that regard, however, we explain the narrow issue raised in the context of an award of attorney fees.

■ ■      Ordinarily, American courts—including those in Oregon—"will not award attorney[ ] fees to the prevailing party absent authorization of statute or contract." *Atiyeh v. State of Oregon*, 326 Or 531, 536, 956 P2d 177 (1998) (internal quotation marks and footnote omitted). ORS 20.105, the statute under which the trial court awarded attorney fees in this case, is an exception to that general rule. That statute, *see* 195 Or App at 364 n 1, provides that a court shall award

attorney fees if a nonprevailing party has asserted a claim for which it had no objectively reasonable basis. An award of attorney fees under ORS 20.105 requires the trial court to determine, among other things, whether the party's claim was "objectively reasonable." We, in turn, review that determination for an error of law. *Secor Investments, LLC v. Anderegg*, 188 Or App 154, 175, 71 P3d 538 (2003).

■      The sole question before us is whether the bank had "no objectively reasonable basis" for its equitable subrogation claim.[4] Whether a party has an objectively reasonable basis for asserting a claim is a function of the substantive law governing the claim. In our previous opinion, we explained that the doctrine of equitable subrogation "has been described" as follows:

> " '[I]f the holder of a mortgage take[s] a new mortgage as a substitute for a former one, and cancel[s] and release[s] the latter in ignorance of the existence of an intervening lien upon the mortgaged premises, although such lien be of record, equity will, in the absence of the intervening rights of third parties, restore the lien of the first mortgage and give it its original priority.' "

*Dimeo*, 164 Or App at 571 (quoting *Pearce v. Buell*, 22 Or 29, 33, 29 P 78 (1892)) (bracketed material in original).[5] Notably, the doctrine does not apply "unless the lender proves that it was ignorant of the existence of the intervening lien and that its ignorance was not a result of inexcusable negligence." *Id.*; *see Holzmeyer v. Van Doren*, 172 Or 176, 185, 139 P2d 778 (1943) (party seeking equitable subrogation must have been "ignorant of the existence" of the intervening lien); *Metropolitan Life Ins. Co. v. Craven*, 164 Or 274, 283, 101 P2d 237 (1940) (equitable subrogation available only if "the party advancing the money to defray the prior lien is not guilty of negligence").

---

[4] The bank does not dispute that plaintiff is the prevailing party.

[5] Although the *Pearce* formulation of the doctrine refers to the substitution of one mortgage for another, we have held that the doctrine may apply in a case such as this one, in which the lender releases funds to the mortgagor on condition that the mortgagor use the funds to pay off an existing trust deed. *Rusher v. Bunker*, 99 Or App 303, 782 P2d 170 (1989).

■     As noted, the only aspect of equitable subrogation at issue here is the element of "excusable ignorance." In our prior decision, we focused on whether reliance on a subsequent title insurance policy could constitute excusable ignorance of the existence of existing liens. And we made it clear that no Oregon case had defined what would amount to excusable ignorance in that situation. *Dimeo*, 164 Or App at 572. Moreover, "questions of priority and subordination, in equitable subrogation and related contexts, turn to some degree on the competing equities in specific cases." *Lewis v. Investors Leased Group II*, 118 Or App 361, 367 n 2, 848 P2d 113 (1993). In short, no Oregon appellate court has defined what constitutes "excusable ignorance" generally, much less in a case like this one. Thus, the legal contours of "excusable ignorance" in the context of equitable subrogation remain undefined.[6]

When it asserted its equitable subrogation claim, the bank had evidence that its manager had instructed the escrow agent to ensure that the Dimeo and Chrisman liens were removed. It reasonably understood that its manager had received assurances that the funds would not be disbursed unless the bank was in first position. Moreover, at the time that the bank asserted its claim, it had evidence— although perhaps ambiguous—that the manager had seen a title insurance policy showing the bank in first position. Although it later turned out that the manager had not seen the title insurance policy before the funds were disbursed, and although the trial testimony ultimately was somewhat more equivocal than were the affidavit and depositions on which the bank relied, those developments were not inconsistent with the bank's objectively reasonable basis for asserting the claim in the first place.[7]

---

[6] Indeed, whether ignorance of the existing liens should be required for equitable subrogation is the topic of some debate. *See generally Restatement (Third) of Property: Mortgages* § 7.6 comment e (1997) ("Under this Restatement * * * subrogation can be granted even if the payor had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant. The question in such cases is whether the payor reasonable expected to get security with a priority equal to the mortgage being paid.").

[7] Plaintiff contends that the bank should have dropped its equitable subrogation claim when it became evident that McGinnis had not relied on the title insurance policy when he disbursed the funds. *See McCarthy v. Oregon Freeze Dry, Inc.,*

■    While we understand the trial court's concerns regarding the bank's representations, the court missed the mark for purposes of ORS 20.105. In determining whether the bank had an objectively reasonable basis for asserting an equitable subrogation claim, the sole issue is whether there is evidence in the record to support the bank's claim. Specifically, a party has no objectively reasonable basis for asserting a claim only if the party's position is "entirely devoid of legal or factual support at the time it was made." *Mattiza*, 311 Or at 8 (footnote omitted).[8] The bank's equitable subrogation claim was not "entirely devoid of legal or factual support at the time it was made." *Id.*

■■    Two further points support our conclusion that the bank had an objectively reasonable basis for its claim. First, because the doctrine of equitable subrogation is "founded on principles of equity and benevolence," *McBride v. McBride*, 148 Or 478, 483, 36 P2d 175 (1934), it necessarily is a flexible concept. For that reason, it is a rare case in which a party that has even some evidence to support the claim can be said to have no "objectively reasonable basis" for doing so. Second, in evaluating whether a party has an objectively reasonable basis for asserting a claim, the temporal focus should be on the time that the claim is asserted. In this case, the evidence included the conversations between the bank's branch manager and the escrow agent. That the evidence at trial turns out to be weaker—in this case weak enough that the trier of fact rejected the claim—is not properly part of the inquiry.

Award of attorney fees reversed.

---

334 Or 77, 84, 46 P3d 721 (2002) (attorney fees may be appropriate when a party continues to litigate a claim after facts emerge that make the claim objectively unreasonable). But, as we explain in the text, even in the absence of reliance on the title insurance policy, the bank had an objectively reasonable basis for its claim.

[8] The *Mattiza* court was construing an earlier version of ORS 20.105 when it used the quoted language to describe a "meritless" position. Nonetheless, this court previously has interpreted the current "no reasonably objective basis" standard to be synonymous with the "meritless" standard enunciated in *Mattiza*. *Mantia v. Hanson*, 190 Or App 412, 431, 79 P3d 404 (2003).