Argued and submitted September 21, 2022, reversed June 22, 2023

Jennifer ANDLOVEC,
an individual et al.,
*Plaintiffs,*
*and*

Jeffery CALLAHAN,
*Intervenor Plaintiff-Appellant,*

*v.*

Christopher SPOTO,
an individual et al.,
*Defendants,*
*and*

STORM 3, LLC,
*Defendant-Respondent.*

Deschutes County Circuit Court
17CV11011; A175537

532 P3d 531

In this attorney fee case, plaintiff appeals from the trial court's award of attorney fees to defendant under ORS 20.105 for pursuing claims with "no objectively reasonable basis." In a single assignment of error, plaintiff argues that the trial court erred by considering impermissible factors in making its decision, and by concluding that plaintiff's claims were "entirely devoid" of legal or factual support. *Held*: The trial court erred by impermissibly applying factors under ORS 20.075 to its analysis of whether a fee award was required and by incorrectly concluding that the record was "entirely devoid" of support.

Reversed.

Raymond D. Crutchley, Judge.

Nicholas A. Kampars argued the cause and filed the briefs for appellant.

Shannon McCabe argued the cause for respondent. Gregory P. Lynch and Lynch Murphy McLane LLP filed the brief for respondent.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Reversed.

## MOONEY, J.

This attorney fee case concerns a failed marijuana production operation started by two individuals, Callahan and Spoto, and run under the name of Farmington Industries, LLC (Farmington), for the purpose of producing marketable medical and recreational marijuana. The underlying lawsuit was filed by several Farmington investors against Spoto, Farmington's attorney (Smiley), and Storm 3, LLC (Storm 3), seeking damages for financial losses that the investors alleged that they suffered when the business failed. Callahan later intervened in that lawsuit as a plaintiff. Spoto filed for bankruptcy, and any personal liability that he might incur as a result of this lawsuit was discharged by the bankruptcy court. In the end, the claims of the investors who initially filed the lawsuit were voluntarily dismissed, followed by the trial court's dismissal of Callahan's remaining claims against Storm 3 on summary judgment. The only issue before us is whether the trial court erred when it awarded Storm 3 attorney fees.

Callahan appeals from the Supplemental Judgment and Money Award entered against him and he assigns error to the trial court's granting of Storm 3's petition for attorney fees under ORS 20.105.[1] He first argues, correctly, that the trial court erred when it considered the factors listed in ORS 20.075 in deciding *whether* to award such fees to Storm 3. The trial court's written opinion states that it "considered the factors set forth in ORS 20.075(1) and (2) in determining *whether* an award of attorney fees and costs should be ordered[.]" (Emphasis added.) But the factors in ORS 20.075 "apply when another source of law gives a court *discretion* to award attorney fees," and those factors do not apply to a request for a mandatory award of fees under ORS 20.105. *Williams v. Salem Women's Clinic*, 245 Or App 476, 483, 263 P3d 1072 (2011) (emphasis in original). The court, thus, erred in considering those factors in its decision-making process regarding whether to award attorney fees.[2]

---

[1] ORS 20.105 provides, in part, that the court shall award attorney fees to a prevailing party if "there was no objectively reasonable basis for asserting the claim[.]"

[2] Although we could remand the matter to the trial court to apply the correct legal standard as contained in ORS 20.105, the question is one of law, and we

Callahan next argues that he had an objectively reasonable basis on which to pursue his claims against Storm 3 and, therefore, that the award of attorney fees to Storm 3 was improper. Storm 3 counters that Callahan's "claims became objectively unreasonable following factual determinations by the [bankruptcy court] in [the] adversary proceeding directly related to the claims asserted in" this case. We conclude that Callahan's claims were not without an objectively reasonable basis and, therefore, the trial court erred when it awarded attorney fees to Storm 3 under ORS 20.105. We reverse the attorney fee award and the supplemental judgment awarding those fees to Storm 3.[3]

Whether a claim lacks an objectively reasonable basis under ORS 20.105 is a question of law. *See Secor Investments, LLC v. Anderegg*, 188 Or App 154, 175, 71 P3d 538 (2003). "[F]or purposes of ORS 20.105(1), a claim, defense, or ground for appeal or review is meritless when it is entirely devoid of legal or factual support at the time it was made." *Mattiza v. Foster*, 311 Or 1, 8, 803 P2d 723 (1990) (footnotes omitted). Attorney fees under ORS 20.105 might also become appropriate when a party continues to litigate a claim or defense "after it is clear that the plaintiff's legal position no longer has any arguable support in the law as applied to the facts." *McCarthy v. Oregon Freeze Dry, Inc.*, 334 Or 77, 85, 46 P3d 721 (2002). We review the record for any evidence that supports plaintiff's claims. *See Magno, LLC v. Bowden*, 313 Or App 686, 695, 496 P3d 1049 (2021) ("[T]he question is whether any evidence, if offered and believed, or any legal authority, would support a finding and a resulting judgment for plaintiff."). "We describe the pleadings, litigation, and evidence in light of that standard, without considering the trial court's resolution of disputed historical facts." *Williams*, 245 Or App at 478.

As mentioned, Callahan and Spoto operated as Farmington, a limited liability company, for the purpose of producing marketable marijuana. Both Callahan and Spoto

---

will, therefore, follow the more efficient path of applying the correct standard and answering the legal question ourselves. *Williams*, 245 Or App at 483.

   [3] Our disposition obviates the need to address the parties' arguments concerning the amount of attorney fees and, therefore, we do not do so.

made financial and nonfinancial contributions to the marijuana operation. Although it is unclear whether Callahan and Spoto were both listed as members of Farmington, they were both actively involved in its marijuana production operations and business. In June of 2015, Farmington entered into a five-year lease to construct and operate a marijuana production facility in Bend. Under the lease, Farmington was responsible for all improvements to the land, but such improvements were to be surrendered to the landlord with the leased premises upon expiration or termination of the lease.

After the lease was signed, Callahan and Spoto employed Smiley for legal advice and assistance concerning Farmington's business structure and operations. Smiley proposed that Farmington adopt a structure in which two trusts would be created with each trust to serve as a member of the limited liability company. One trust would hold the combined ownership interests of Callahan and Spoto, and the other would hold the combined ownership interests of other investors. Spoto was to be named the trustee of both trusts and was also to serve as Farmington's manager. An operating agreement generally reflecting the proposed structure was drafted, and Spoto signed it in April 2016. Callahan did not sign that agreement, but he did agree conceptually with the proposed structure.[4]

Tension developed between Spoto and Callahan, primarily related to Farmington's finances. That tension grew and, in the fall of 2016, culminated in a disagreement about whether to accept a particular investment from

---

[4] Callahan and other investors later learned that Smiley did not draft or otherwise memorialize the trusts that he proposed to create to hold the Farmington ownership interests. The record does not include any written trust agreements, and the testimony indicates that the agreements were never drafted. Smiley admitted that he did not memorialize the trusts and that it was not clear to him who the settlors of the trusts were to have been. The parties nevertheless agree that the trusts that were supposed to be drafted were described accurately in the April 2016 operating agreement, and they rely on that agreement in making their respective arguments in this case. They litigated the dischargeability of Spoto's liability to them, in the bankruptcy proceeding that we later describe, as if the trusts existed and in reliance on the April 2016 operating agreement. There were also claims made by Callahan and the other investors against Smiley for breach of fiduciary duty and legal malpractice alleging, among other things, failure to create the trusts, but those claims are not before us.

Kevin Kahmann. Kahmann and his wife, Valerie, lived in Minnesota at the time. They owned various companies, one of which employed Spoto's wife. The proposed investment was to be from Storm 3, one of the Kahmanns' companies. Spoto wanted to accept the investment, but Callahan was opposed to that, expressing concerns about the Kahmanns' financial stability. Storm 3 was registered in Oregon as a limited liability company in February of 2017.

In January 2017, as Spoto and Callahan worked to resolve their dispute, most of Farmington's marijuana crop disappeared.[5] As a result, Farmington was no longer able to meet its lease obligations and Spoto decided to terminate the lease as of February 1, 2017. Within days, Valerie Kahmann signed a new lease for the same property that then included the significant improvements that had already been made by Farmington. Valerie Kahmann signed the new lease as the authorized representative of the new tenant, Storm 3, and also personally, as guarantor. The effective date of the new lease was February 1, 2017. Spoto dissolved Farmington by the end of that same month.

In March 2017, the investors filed this lawsuit alleging various claims against Spoto, Storm 3, and Smiley. As relevant here, they asserted that Spoto had breached his fiduciary duty to them, and that Storm 3 had worked in concert with Spoto to facilitate what amounted to a fraudulent transfer of the lease from Farmington to Storm 3. Callahan filed a motion to intervene as a plaintiff, arguing that he had a right to intervene under ORCP 33 B and that, in any event, his intervention as a party would be permissible under ORCP 33 C. Storm 3 did not object to Callahan's motion and did not otherwise oppose his intervention into this case as a plaintiff. The court granted the motion for Callahan to intervene as a plaintiff in April of 2017.[6]

The plaintiffs, including Callahan, filed an amended complaint in December of 2017, that, among other things,

---

[5] It is unclear how or why the marijuana crop disappeared. Although there is some suggestion that it was stolen, the record does not contain evidence of any related investigative efforts or of any charges having been brought against anyone.

[6] Any reference to "investors" from this point forward includes Callahan unless otherwise indicated.

added two new claims against Storm 3: intentional interference with economic relations (IIER) and unjust enrichment. Storm 3 filed a motion seeking dismissal of certain claims in the amended complaint. The court dismissed the fraudulent transfer and unjust enrichment claims; however, it denied Storm 3's motion to dismiss the IIER claim, and the parties proceeded with discovery.

Spoto filed for bankruptcy after the lawsuit was filed, and the investors initiated an adversarial bankruptcy proceeding, seeking to prevent the discharge of Spoto's potential liability to them. They asserted two claims against Spoto under 11 USC section 523(a): (1) fraud while acting in a fiduciary capacity, 11 USC § 523(a)(4), and (2) willful and malicious injury, 11 USC § 523(a)(6).[7]

At a hearing in November 2018, the bankruptcy court found that Spoto did not owe a fiduciary duty to the investors; however, it excluded Callahan from that finding. It nevertheless denied the request of all investors, including Callahan, to except their claims against Spoto from discharge under 11 USC section 523(c) because it found that Spoto's actions did not "rise to the level of fraud" under section 523(a)(4) of that code. The bankruptcy court also declined to except the investors' claims against Spoto from discharge after finding that Spoto did not terminate Farmington's lease with the intention of injuring the investors within the meaning of 11 USC section 523(a)(6). Spoto's potential liability was, thus, determined to be dischargeable by the bankruptcy court and the litigation below proceeded on that basis, without Spoto.

The parties engaged in extensive discovery efforts and motions, and Callahan and the other investors filed

---

[7]  11 USC section 523 provides, in relevant part:

"(a)  A discharge under [relevant sections] of this title does not discharge an individual debtor from any debt—

"* * * * *

"(4)  for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

"* * * * *

"(6)  for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"

a motion seeking to file a second amended complaint that would add a claim against Storm 3 alleging that it had aided and abetted Spoto in breaching Spoto's fiduciary duty to them (the AABFD claim). Although a hearing had been scheduled for oral argument on that motion, it was canceled by agreement of the parties because the defendants, including Storm 3, had no objection to its filing. The second amended complaint was, thus, filed in March of 2019.

In August 2019, Storm 3 filed a motion seeking summary judgment in its favor on the IIER and the AABFD claims. The trial court heard that motion in December 2019, and granted it in part, as to the AABFD claim, at the conclusion of the hearing. In particular, the court explained that it considered itself to "be bound by the factual findings of [the bankruptcy court's] judicial officer with respect to the acts of Mr. Spoto." Noting that the bankruptcy court had found that Spoto did not owe a fiduciary duty to the investors, the trial court reasoned that Storm 3 could not be held liable to those investors for aiding and abetting Spoto in breaching a duty that he did not owe them. The trial court reserved ruling on the motion as to the IIER claim and took that matter under advisement. By letter to counsel dated July 17, 2020, the trial court stated that it had reviewed its files and the record and concluded that "there is a genuine issue of material fact as to the IIER cause of action" and it denied Storm 3's motion for summary judgment on that claim.

Ultimately, all plaintiffs except for Callahan agreed to dismiss their remaining claims, leaving Callahan's IIER claim against Storm 3 the only unresolved claim against Storm 3. In August 2020, Storm 3 filed another summary judgment motion against the IIER claim, this time asserting that the claim belonged to Farmington, and that Callahan lacked standing to pursue that claim as a nonmember. The trial court granted that motion by written order "for the reasons stated on the record."

Storm 3 then filed its petition for attorney fees under ORS 20.105(1), asserting that Callahan had no objectively reasonable basis for pursuing his claims against Storm 3 and seeking the fees it incurred after the bankruptcy court issued its ruling on the dischargeability of the investors'

claims. The trial court awarded attorney fees to Storm 3 in the amount of $64,585. Callahan appeals from the associated supplemental judgment.

As a general rule, Oregon courts do not award attorney fees to opposing parties in litigation absent a statutory or contractual right. *Swett v. Bradbury*, 335 Or 378, 381, 67 P3d 391 (2003). ORS 20.105 provides one of the statutory rights to attorney fees, and provides, in relevant part:

> "In any civil action, suit or other proceeding in a circuit court ***, the court shall award reasonable attorney fees to a party against whom a claim *** is asserted, if that party is a prevailing party in the proceeding and to be paid by the party asserting the claim *** upon a finding by the court that *** there was no objectively reasonable basis for asserting the claim[.]"

Under ORS 20.105, the fact that a party does not prevail on a claim does not mean that the claim was wholly without merit. *See Mattiza*, 311 Or at 8. Indeed, the adversarial nature of our justice system presumes that each case has a winning and a losing argument. It is only when it is obvious that a claim is without merit—because it is entirely devoid of support—that a punitive award of attorney fees is proper. This is not one of those cases.

As already mentioned, Storm 3 argues that once the bankruptcy court found "that no fiduciary relationship existed" between Spoto and Callahan as "relating to Farmington," Callahan had a "duty to evaluate his claims in light of [that] ruling," and dismiss the case because he lacked the necessary standing to pursue it and, therefore, no longer had an objectively reasonable basis to continue pursuing his claims. The parties disagree about whether the trial court was bound by the bankruptcy court's factual findings. Storm 3 points to the trial court's conclusion "that [it] was factually estopped from arriving at a conclusion contrary to" that of the bankruptcy court, but Storm 3 cites no authority and makes no legal argument to support the correctness of that conclusion. For his part, Callahan describes the findings made by the bankruptcy court under the bankruptcy code, and he argues that those findings do not establish the unreasonableness of his claims against Storm 3 in this case.

To the extent that the parties appear to raise an estoppel or preclusion argument, it is not "our proper function to make or develop a party's argument when that party has not endeavored to do so itself." *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193 (2003). We will nevertheless address the parties' respective arguments as we understand them, to the extent necessary to carry out our "obligation to review the rulings of the trial court for errors of law." *State v. Remsh*, 221 Or App 471, 475, 190 P3d 476 (2008). We, thus, turn briefly to the bankruptcy court's findings.

The bankruptcy court limited its findings about fiduciary duties and "fraud" to the context in which it made those findings—determining the dischargeability of debt under the federal bankruptcy code. As that court explained when it ruled from the bench,

> "[I]t is important to remember this Court's role. * * * Congress has defined nondischargeable debts narrowly with the goal of targeting debtors who take affirmative steps to inflict substantial injury. While Mr. Spoto may not have conducted himself perfectly, he did not commit any malfeasance significant enough to except [the investors'] claims from discharge."

The bankruptcy court carefully limited its findings to the record before it under the law that it was applying. Moreover, the bankruptcy court made clear findings, and it did not find that Spoto owed no fiduciary duty to Farmington. It did not find that no duty of loyalty existed between Spoto and Callahan as "relating to Farmington" as Storm 3 now argues. It concluded that Spoto owed no fiduciary duty to the investors, but it excluded Callahan from that finding. Regardless of whether the bankruptcy court findings were binding on the trial court, an issue we do not decide, those findings do not answer the question whether Callahan's claims lacked an objectively reasonable basis under ORS 20.105.

In determining whether to award Storm 3 attorney fees under ORS 20.105, the trial court concluded that, "consistent with the Court's prior summary judgment rulings, the Court also finds that Callahan lacked any objectively

reasonable basis for asserting his claims." But the standard under ORCP 47 by which a trial court evaluates a motion for summary judgment to determine whether the moving party is entitled to prevail as a matter of law is not the same as the standard under ORS 20.105, by which a court evaluates an attorney fee request to determine whether there was an objectively reasonable basis for the claim at all. The fact that the trial court granted summary judgment motions does not necessarily mean that Callahan had no objectively reasonable basis for asserting and pursuing his claims in the first place, and it does not establish the unreasonableness of those claims. We have held in an analogous context that the denial of a motion for directed verdict does not necessarily establish the reasonableness of the claim moved against. *See Daniels v. Johnson*, 306 Or App 252, 473 P3d 1133 (2020). The converse of that—that the granting of summary judgment does not necessarily establish the unreasonableness of the claim moved against—is at least as true. As we have explained, the question for the trial court under ORS 20.105 is whether Callahan's claims against Storm 3 were entirely devoid of legal or factual support. That is a different question than the one that was presented to the trial court on the earlier summary judgment motions.

Whether a party has an objectively reasonable basis for asserting a claim is a function of the substantive law governing that claim. *Dimeo v. Gesik*, 195 Or App 362, 369, 98 P3d 397 (2004), *adh'd to as modified on recons*, 197 Or App 560, 106 P3d 697 (2005). But, here, Storm 3's focus is not on the legal elements of Callahan's AABFD or IIER claims. It instead focuses on whether the record supports a conclusion that Callahan had standing to pursue those claims, in particular after the bankruptcy court made its ruling. As we have explained, the bankruptcy court's findings are not dispositive of standing in this case.

"'[S]tanding' means the right to obtain an adjudication. It is thus logically considered prior to consideration of the merits of a claim. To say that a plaintiff has 'no standing' is to say that the plaintiff has no right to have a tribunal decide a claim under the law defining the requested relief[.]" *Eckles v. State of Oregon*, 306 Or 380, 383, 760 P2d 846

(1988). As explained by one constitutional scholar, stand-
ing "is an answer to the very first question that is some-
times rudely asked when one person complains of another's
actions: 'What's it to you?'" Antonin Scalia, *The Doctrine
of Standing as an Essential Element of the Separation of
Powers*, 17 Suffolk U L Rev 881, 882 (1983).

        The basis of Callahan's standing was set forth in his
motion to intervene and is set forth in the second amended
complaint, where it is alleged that plaintiffs "bring this
action derivatively, on behalf of [Farmington] and on their
own behalf as members of [Farmington]." Callahan first
joined this lawsuit as a plaintiff after filing his ORCP 33
motion to intervene. In that motion, he asserted, among
other things, that he had assisted in founding and develop-
ing Farmington's business through cash and noncash con-
tributions, and that he was promised an equal ownership
in that business by Spoto and Smiley. He alleged that his
cash contributions were to be combined with Spoto's cash
contributions and held in a trust, with Callahan and Spoto
as settlors, and Spoto as trustee. That trust was to be one of
two members of the Farmington limited liability company.
Callahan alleged that Spoto breached his fiduciary duty to
Farmington, to its investors, and to Callahan, when Spoto's
mismanagement of Farmington's business and the trusts
led to the termination of the lease for the production facility
and the subsequent transfer of that lease to Storm 3. Storm
3 did not object to Callahan's motion, and he was permitted
to intervene.

        After Callahan and the other plaintiffs added the
IIER claim against Storm 3, the trial court denied Storm
3's ORCP 21 A motion to dismiss that claim. And although
Storm 3 initially objected to plaintiffs' motion to file a sec-
ond amended complaint, which included the IIER claim and
added the AABFD claim, Storm 3 withdrew its objection,
and the motion was granted without a hearing. Callahan
does not make a waiver argument based on Storm 3's acqui-
escence to Callahan's intervention as a plaintiff or to the
amendment. But this case is factually and procedurally com-
plex, and whether there was support for Callahan's claims
at any given point cannot be analyzed in a vacuum, without

regard to the context in which Callahan was permitted to join this case.

Whether Callahan was a member of Farmington or whether the trusts referred to in the operating agreement became the members in 2015 or 2016 is unclear. As noted above, no trust agreements were ever drafted or signed. However, the parties rely on the operating agreement for their arguments here, and the agreement states that the manager has a fiduciary duty to Farmington and to its members. Despite any confusion about whether the trusts exist,[8] there is support in the record for Callahan's claim that Spoto owed him a duty of loyalty in relationship to the trust that held, or was supposed to hold, their joint interests in Farmington and was, according to the operating agreement, itself a member of Farmington to which Spoto owed a duty under ORS 63.155.

"[T]he overall persuasiveness of evidence is not the question before us" under ORS 20.105. *Daniels*, 306 Or App at 257. Our task is not to determine whether the evidence creates a genuine issue of material fact for Callahan's claims to survive a summary judgment motion, and it is not to decide whether the evidence is sufficient to support a verdict in Callahan's favor. Our task is to determine whether the record was "entirely devoid" of legal or factual support for Callahan's claims, because it is only when the record is devoid of such support that an award of attorney fees under ORS 20.105 would be proper. After reviewing the record before us, we conclude that the record was not entirely devoid of support for Callahan's claims. The trial court erred when it concluded otherwise. The supplemental judgment awarding attorney fees to Storm 3 is therefore reversed.

Reversed.

---

[8] We need not determine whether the trusts could, or might, have arisen by operation of law without written trust documents.